FILED

JUL 2 6 2010

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BROGAN T. LYNCH,

       Plaintiff,

       CV. 09-6170-PK

v.

       FINDINGS AND
       RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

---

PAPAK, Magistrate Judge:

Plaintiff Brogan Lynch brought this action June 15, 2009, seeking judicial review of a final decision of the Commissioner of Social Security denying his application for Supplemental Security Income (SSI) disability benefits under Title XVI of the Social Security Act. This court has jurisdiction under 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)).

Lynch argues that the Commissioner erred when he discredited the opinions of Lynch's treating physician, when he discredited Lynch's testimony regarding his pain symptoms, when he failed to consider Lynch's mental impairments in his analysis and when he concluded that Lynch was capable of performing jobs existing in significant numbers in the national economy. I have

Page 1- FINDINGS AND RECOMMENDATION

considered all of the parties' briefs and all of the evidence in the administrative record. For the reasons set forth below, the Commissioner's decision should be affirmed.

## DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. § 404.1520(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. § 404.1520(a)(4)(i). If the ALJ finds that the claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i), 404.1520(b). Otherwise, the evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments. *See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities and is expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 404.1520(c). The ability to perform basic work activities is defined as "the abilities

and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. § 404.1520(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related, physical and mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. § 416.945(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

404.1520(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof is, for the first time, on the Commissioner.

At the fifth step of the evaluation process, some individuals limited by physical impairments to sedentary or light work must be found disabled, depending on their age and vocational education level. 20 C.F.R. § 404, Subpt. P, App. 2. The so-called "grids" contained in Tables 1 and 2 of Appendix 2 to Subpart P of Section 404 set forth the criteria for determining whether such a nondiscretionary finding must be made. In the event the grids do not mandate a finding of "disabled," the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether the claimant can perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566. If the Commissioner meets his burden to demonstrate that the claimant is capable of performing jobs existing in significant numbers in the national economy, the claimant is conclusively found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c), 404.1566. A claimant will be found entitled to benefits if the Commissioner fails to meet his burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied proper legal standards and his or her findings are supported by substantial evidence in the record.

*See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r for Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004).  "'Substantial evidence' means more than a mere scintilla, but less than a preponderance; it is such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Id.*, *citing Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998).  The court may not substitute its judgment for that of the Commissioner. *See id.*, *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006); *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001).  If the ALJ's interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible [of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## BACKGROUND

Lynch was born March 17, 1953. Tr. 25.[2]  He graduated from high school and attended a few semesters of college. Tr. 25.  He has worked in the past as a chef, baker, night supervisor at a herbal company and ice cream store manager. Tr. 25-28, 96-102, 106, 134-141, 342-343.  At the time of his hearing before the Administrative Law Judge, he was working between eight to twelve hours a week as an ice cream server. Tr. 25-26.

On December 30, 2005, Lynch filed an application for Title XVI Social Security

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed herein as Docket No. 12.

Page  5- FINDINGS AND RECOMMENDATION

insurance benefits, Tr. 93-95. In his SSI application he alleged a disability onset date of July 28, 2005. Tr 93. Lynch describes his disabling medical condition as "regional pain syndrome." Tr. 105. He asserts that this condition limits his ability to work as follows: "Due to the pain in my leg I can only stand two hours a day before the pain is very bad." Tr. 105. He asserts that this condition first began to bother him in 1997, and left him unable to work due to severe pain combined with "another injury" as of July 28, 2005. Tr. 105.

The earliest medical report appearing in the administrative record dates from April 13, 2003, at which time Lynch had a normal EKG after complaining about chest pains at Sacred Heart Medical Center. Tr. 174. Subsequently, Lynch established treatment with Dr. Mark Dukeminier, an internist. Tr. 292-293. Lynch was suffering from chronic pain related to a saphenous nerve injury in his left leg following knee surgery from 1997. Tr. 292. Previously, he had been seeing Dr. Joseph Dunn, a pain specialist, and had been placed on a regimen of MS Contin (morphine) and Neurontin with Vicodin ES for occasional "break-through" pain. Tr. 292. At the time he visited Sacred Heart Medical Center, Lynch's pain was reasonably well-controlled and he was able to function and was employed. Tr. 292.

The next day, Lynch was examined for initial outpatient occupational therapy. Tr. 181. He was suffering from a distal phalanx fracture on the radial side of his left thumb. Tr. 176. Lynch had been thrown over the handlebars of his bike eight weeks prior, and was reporting pain and stiffness of his left thumb. Tr. 181.

On March 3, 2004, Dr. Dukeminier rechecked Lynch's left knee. Tr. 288. On April 8, 2004, Lynch consulted with Dr. Sharon Meyers for a rash and left shoulder pain. Tr. 286. Dr. Meyers gave Lynch information about fungal infection for his rash and Bextra for his shoulder

Page  6- FINDINGS AND RECOMMENDATION

pain. Tr. 287.

On May 4, 2004, Lynch consulted Dr. Dukeminier for an abscess on his left upper anterior thigh. Tr. 283. Dr. Dukeminier drained the abscess and sent it for bacterial culture testing. Tr. 284, 329-330. On May 12, 2004, Lynch had another office visit with Dr. Dukeminier for continuous pain in his left shoulder due to a January 2004 skiing accident. Tr. 281. Dr. Dukeminier referred him to Orthopedic Healthcare Northwest. Tr. 282.

On June 28, 2004, Lynch started physical therapy to relieve pain and to improve strength in his left shoulder at Orthopedic Healthcare Northwest. Tr. 175. On July 22, 2004, Lynch was still complaining about decreased functional use of his left shoulder. Tr. 177. He was given a home exercise program to follow. Tr. 177. On August 26, 2004, Lynch saw Dr. Trek Lyons. Tr. 185. Lynch reported as being able to do regular activities that summer without significant complaints. Tr. 185.

On September 1, 2004, Lynch consulted with Dr. Dukeminier, complaining of increased pain in his left leg. Tr. 279. Dr. Dukeminier increased his MS Contin dosage to 30 mg twice a day. Tr. 279. On December 7, 2004, Lynch was examined by Dr. Dukeminier once more for pain at his upper right sacroiliac joint. Tr. 277. Lynch reported increased pain symptoms when he was biking, golfing or scooping ice cream. Tr. 277. Dr. Dukeminier suggested physical therapy and Tylenol. Tr. 277. Lynch failed to comply with the physical therapy recommendation because his insurance, Oregon Health Plan, did not cover it. Tr. 277.

On March 14, 2005, Lynch consulted with Dr. John Mundall regarding intermittent numbness along his ulnar forearms and into the fourth and fifth fingers of both hands when Lynch was sitting in certain positions or resting his arms. Tr. 420. Dr. Mundall referred Lynch

for nerve conduction studies.  Tr. 419.

On March 15, 2005, Lynch reported to Dr. Dukeminier that he had experienced significant relief from chronic leg pain with MS Contin and Neurontin, and was again able to lead his normal life style.  Tr. 275.

On April 6, 2005, Lynch went to the emergency room at Sacred Heart Medical Center for chest pain after falling while skiing four to five days prior.  Tr. 210.  The emergency room doctors examined Lynch with cardiac monitor, EKG and chest X-ray and found nothing wrong with him.  Tr. 211.  On April 11, 2005, Lynch was given a stress-test on a treadmill.  Tr. 302-327.  He exercised 11 minutes and 30 seconds on the treadmill and his stress test was entirely normal.  Tr. 273 and 300.  On April 20, 2005, Lynch was still complaining about chest pains due to his fall while skiing.  Tr. 273.  Examination on that date revealed no problems.  Tr. 273.

On April 21, 2005, Lynch also consulted with Dr. Mundall about the numbness in his hands.  Tr. 419.  An electrical study showed a slight slowing of the conduction velocity only in Lynch's left elbow.  Tr. 419.  Dr. Mundall suspected mild left cubital tunnel syndrome and suggested wearing an elbow guard to prevent Lynch "hitting his crazy bone several times a week at work."  Tr. 418.

On July 7, 2005, Lynch was hit on the ankle with a swinging gate at work.  Tr. 200-201.  On July 19, 2005, Lynch saw Dr. Thomas Thrall at Cascade Occupational Health about his ankle.  Tr. 201.  Lynch reported that he had been able to continue walking on his ankle, but he had "some discomfort with being on his feet all day."  Tr. 201.  Dr. Thrall observed some mild swelling in the ankle, diagnosed Lynch as having left ankle contusion (bruise) and released Lynch to modified duty.  Tr. 201.  X-ray of the left ankle revealed normal bone structure.  Tr.

203. On July 26, 2005, Lynch consulted with Dr. Jon Feldman about his ankle again. Tr. 197-199. Dr. Feldman found slight swelling in the ankle, but Lynch was nevertheless still able to bear weight and walk without problems. Tr. 198. Dr. Feldman suspected that some of Lynch's reported pain was due to his chronic condition. Tr. 198.

On August 1, 2005, Lynch saw Dr. Travis Lynch for pain in his ankle. Tr. 196. Dr. Travis noted mild soft tissue swelling in the ankle and recommended that Lynch alternate between sitting and standing during work. Tr. 196. Lynch requested a referral for physical therapy. Tr. 196.

On August 11, 2005, Lynch consulted with two other doctors, Dr. Thrall and Dr. Mundall, about his ankle pain. Tr. 193-194 and 417-418. Dr. Thrall found Lynch's ankle objectively normal. Tr. 194. Lynch reported taking time off from work. Tr. 194. On August 12, 2005, Lynch informed his physical therapist, Travis Nyberg, that his ankle was getting worse after being examined by Dr. Thrall and Dr. Mundall independently the previous day. Tr. 192. Lynch also reported that he continued biking regularly every day. Tr. 192.

On August 15, 2005, Lynch reported to his physical therapist, Sandra Kitzhaber, that his ankle was improving. Tr. 191. On August 19, 2005, Ms. Kitzhaber found Lynch's ankle 50% better. Tr. 190. On August 22, 2005, Ms. Kitzhaber again reported significant improvement in the condition of Lynch's ankle. Tr. 189. On August 25, 2005, Dr. Thrall informed Lynch that his left ankle contusion was totally resolved and that Lynch was to return full duty that day with no limitations. Tr. 187-188.

On October 4, 2005, Lynch complained to Dr. Mundall about numbness in his fingers. Dr. Mundall opined that the numbness might be due to excessive biking. Tr. 416. Lynch

Page 9- FINDINGS AND RECOMMENDATION

informed Dr. Mundall that he would try to limit his biking. Tr. 416. On November 11, 2005, Dr. Mundall performed electrical studies on Lynch's arm nerves and found them to be normal. Tr. 416. Lynch also complained about worsening pain in his right knee and leg. Tr. 416. Dr. Mundall referred Lynch to Dr. Dunn. Tr. 416.

On December 30, 2005, Lynch applied for supplemental security income. Tr. 93-95. He alleged the onset of his disability as July 28, 2005. Tr. 93. On January 17, 2006, Lynch reported "burning and stinging pain in the lower left leg along the calf bone and in back down to foot area." Tr. 154. He also noted that he could be active before needing a rest for four to six hours. Tr. 155.

On January 20, 2006, Lynch complained to Dr. Dukeminier of shortness of breath at nights. Tr. 271-272. Upon examination, Dr. Dukiminier found no evidence of cardiopulmonary disease. Tr. 272. On January 21, 2006, Lynch went to the emergency room of Sacred Heart Medical Center complaining of left chest pain. Tr. 205-206. Lynch had a perfectly normal EKG and echocardiogram for his age. Tr. 209, 263-266, 294-298.

On February 3, 2006, Lynch consulted with Dr. Dukeminier once again for chest pain. Tr. 269-270. Dr. Dukiminier referred him to Dr. John Gundry for cardiology consultation. Tr. 270. On February 20, 2006, Lynch consulted with Dr. Gundry about his chest pain. Tr. 249-250. On February 23, 2006, Lynch had a lower extremity Doppler exam and was found to have no evidence of abdominal aortic aneurysm. Tr 259-262.

Lynch was seen by a Disability Determination Services examining health care provider. On March 8, 2006, Dr. Martin Kehrli assessed Lynch's residual functional capacity and found that there was no significant loss of function that would warrant anything less than medium level

work.  Tr. 224.  Dr. Kehrli also noted a credibility issue with Lynch.  Tr. 222.  Lynch had

disability advisors complete all the questionnaires rather than filling them out himself even

though field officers noted no reading or writing problems during their face to face interviews

with Lynch.  Tr. 222.  On March 10, 2006, the Administration notified Lynch that he had been

found "not disabled" in connection with his claim.  Tr. 70-73.

On March 13, 2006, Lynch consulted with Dr. Dunn regarding numbness in both arms

from elbow to fingers as well as chronic left leg pain.  Tr. 395-400.  Dr. Dunn ordered a new

lumbar MRI and thought that Lynch's description of his pain might be consistent with

sympathetically maintained pain.  Tr. 399.  Dr. Dunn also referred Lynch to Jeff Giulietti for

physical therapy.  Tr. 399.  On March 17, 2006, Lynch underwent a total body bone imaging and

tomographic bone imaging of his lower thoracic and lumbosacral spine.  Tr. 403.  There were no

bony abnormalities in the lower lumbar spine or left lower extremity.  Tr. 393, 403.  Lynch

underwent a coronary "computed tomography angiography" (CTA) on March 20, 2006 and no

abnormalities were noted.  Tr. 248 and 254-257.

On March 21, 2006, Lynch had a lumbar spine MRI at Oregon Imaging Centers.  Tr. 401-

402.  At L3-4 there was a mild transverse disc protrusion and minor canal stenosis and at L2-3,

minimal central disc protrusion was noted.  Tr 402.  In addition, there was no visible nerve root

compression.  Tr. 393.  That day, Lynch also started physical therapy with Jeff Giulietti.  Tr. 336-

337.

On March 28, 2006, Heidi Tajford, a psychiatric mental health nurse practitioner from

Options Counseling Service, diagnosed Lynch with adjustment disorder.  Tr 232- 238.  Lynch

complained about anxiety and intermittent insomnia three times a week.  Tr. 232.  Lynch also

Page  11- FINDINGS AND RECOMMENDATION

stated that he could read significantly better than he could write. Tr. 235. Lynch reported

working in the ice cream shop and cooking meals for a sick friend. Tr. 235.

On April 18, 2006, Lynch had a complete abdomen ultrasound for a suspicious mass on

his liver. Tr. 252. The ultrasound suggested that the mass might be a hemangioma, a benign

mass that did not require any treatment. Tr. 245, 252.

On April 25, 2006, Lynch consulted with Dr. Gundry once more for chest pain. Tr. 245-

246. Dr. Gundry scheduled a cardiac catheterization for Lynch. Tr. 245. Lynch underwent this

procedure on May 2, 2006 and Dr. Gundry found Lynch's coronary anatomy perfectly normal.

Tr. 242-243. On the same day, Dr. Gundry reported to Dr. Dukeminier that the cause of Lynch's

chest discomfort was noncardiac in nature. Tr. 241. Dr. Gundry also noted that Lynch was

riding his bike more regularly without chest pain. Tr. 241. On May 5, 2006, Lynch timely

requested reconsideration of Social Security Administration finding that he was not disabled in

connection with his application for SSI. Tr. 75.

From April to June 2006, Lynch saw his physical therapist, Jeff Giulietti on five

occasions. On June 1, 2006, Giulietti reported very good rehabilitation outcome with all goals

nearly achieved. Tr. 333. Giulietti also opined that Lynch's left leg pain originated in his lumbar

spine. Tr. 333. Lynch reported his pain to be completely absent on occasions when he was

changing how he was using his lumbar spine. Tr 333. Lynch, however, disagreed with Giulietti's

diagnosis and refused to alter his lumbar spine use. Tr. 333. Giulietti opined that Lynch would

continue to have progressively worse leg pain if Lynch did not follow Giulietti's suggestions. Tr.

333.

On June 19, 2006, Lynch consulted with Dr. Dunn and reported to him that physical

therapy did not yield any significant relief in contrast to what he reported to Giulietti. Tr. 333-334, 388. Dr. Dunn gave Lynch Lidoderm patch samples to try non-narcotic medications for pain relief. Tr. 390.

On August 25, 2006, Dr. Alison Prescott, a psychologist, examined Lynch at the request of Disability Determination Services. Tr. 342-346. Dr. Prescott found Lynch to show average range IQ. Lynch showed difficulty and nervousness in reading isolated words and writing moderately difficult sentences. Tr. 346. Lynch showed good short term memory and good concentration. Tr. 344. Lynch was also able to solve arithmetic problems in his head. Tr. 344. Dr. Prescott noted that Lych met criteria for learning disorder due to his self-reported difficulties at school. Tr. 342, 346.

On September 19, 2006, the Administration notified Lynch that its determination on reconsideration did not differ from its original determination. Tr. 75-77.

On October 3, 2006, Lynch consulted with Dr. Mundall in connection with his leg pain and occasional numbness in his fingers. Tr. 414. Dr. Mundall determined Lynch's fingers and feet to have good strength. Tr. 414. Dr. Mundall prescribed Lyrica for Lynch's symptoms. Tr. 414.

On November 9, 2006, Lynch requested a hearing before an Administrative Law Judge to appeal the Commissioner's adverse decision. Tr. 82.

On January 8, 2007, Lynch reported to Dr. Mundall that Lyrica was causing constipation. Tr. 412. Lynch stated that he would get off Lyrica in the next week if he could not resolve his constipation problem. Tr 412. Lynch also reported that the numbness in his fingers was gone. Tr. 412.

On January 22, 2007, Lynch consulted with Dr. Dunn about increased break-through pain nine to ten hours after each MS Contin (morphine) dosage. Tr. 376-379. Dr. Dunn increased Lynch's both MS Contin and Lyrica dosages. Tr. 379. On March 16, 2007, Lynch reported to Dr. Dukeminier that he was doing very well and his pain was very well-controlled. Tr. 405.

On June 25, 2007, Lynch consulted with Dr. Mundall about pain in his leg and numbness in his fingers. Tr. 409-411. Lynch reported constipation due to pain medication. Tr. 409. Lynch also stated that he rode his bike frequently. Tr. 409. Dr. Mundall recommended another electrical study for Lynch's ulnar nerves to look for objective evidence of loss of nerve function. Tr. 410. On July 18, 2007, Dr. Mundall conducted electrodiagnostic study of Lynch's arms and found no change electrically from his previous study in 2005, but he noted the possibility of a mild left ulnar neuropathy at the elbow. Tr. 422-425. Lynch's right ulnar nerve was completely normal. Tr. 422.

On July 25, 2007, Dr. Mundall referred Lynch to Dr. Ken Butters regarding the possibility of surgery on Lynch's left elbow. Tr. 408. Dr. Mundall noted that Lynch never displayed any clinical evidence of weakness in his arm, but that Lynch was bothered by some pain in his wrist and in his ulnar forearm. Tr. 408.

On September 10, 2007, Dr. Butters evaluated Lynch for his complaints about his arms diagnosed him with left cubital tunnel syndrome. Tr. 438. Dr. Butters recommended elbow pads and gel cycling gloves for Lynch's symptoms as well as a medial epicondylectomy. Tr. 438. Lynch, however, was unenthusiastic about this surgical treatment because he would not be able to bike for six weeks or so. Tr. 438. On November 15, 2007, Dr. Butters evaluated Lynch for the medial epicondylectomy. Tr. 436. On November 20, 2007, Dr. Butters performed the

surgery on Lynch's left arm.  Tr. 434-435.  On November 30, 2007, Dr. Butters saw Lynch two

weeks after the surgery.  Tr. 433.  Lynch reported improved finger sensation, but some elbow

pain.  Tr. 433.  Dr. Butter gave Lynch an elbow pad.  Tr. 433.

On January 10, 2008, Lynch cleared Lynch for light dumbbells, bike riding and then golf

in one month.  Tr. 440.  Lynch reported no wrist pain.  Tr. 440.

On March 6, 2008, Dr. Dunn opined that Lynch could not perform either medium or light

level work in response to a questionnaire from Lynch's attorney.  Tr. 461-463.  Dr. Dunn stated

that Lynch could not lift 50 pounds or push a clutch pedal mechanism or sit longer than one hour

at a time.  Tr. 461-462.  Dr. Dunn also noted his uncertainty whether Lynch could perform

sedentary level work.  Tr. 463.  Dr. Dunn opined that "day-after-day activities and stress [would]

increase back and chest pain" and that Lynch would miss work more than two days per month.

Tr. 463.

On March 19, 2008, an appeal hearing was held before an ALJ.  Tr. 19-67.  The ALJ

heard testimony from Lynch, Tr. 25-52, and a vocational expert, Tr. 52-66.  On April 24, 2008,

the ALJ issued a decision affirming the Commissioner's decisions, and finding that Lynch was

not disabled.  Tr. 9-18.  At step five of the five-step sequential evaluation process, the ALJ

found that Lynch retained the residual functional capacity to perform semiskilled, sedentary-

exertional or light-exertional occupations existing in significant numbers in the national economy

such as cashier II, cafeteria assistant, ticket seller and order clerk for food and beverage.  Tr. 17.

On this basis, the ALJ concluded that Lynch did not meet the criteria for disability.  Tr. 18.

Lynch timely requested administrative review of the ALJ's decision, Tr. 4-5, and on April

16, 2009, the Appeals Council declined his request, Tr. 1-3.  In consequence, the ALJ's decision

became the agency's final order for purposes of judicial review. *See* 20 C.F.R. § 422.210(a); *see also*, *e.g.*, *Sims v. Apfel*, 530 U.S. 103, 107 (2000). This action followed.

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law Judge found in his April 24, 2008, opinion that Lynch did not engage in substantial gainful activity at any time since December 30, 2005. Tr. 11. He therefore proceeded to the second step of the analysis.

At the second step, the ALJ found that Lynch's medical impairments of degenerative disc disease with spinal stenosis, history of medial arthroscopy with possible residual left saphenous neuropathy or regional pain syndrome, history of left cubital tunnel syndrome and rotator cuff syndrome were "severe" for purposes of the Act. Tr. 11. Because the combination of impairments was deemed severe, the ALJ properly proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Lynch's impairments was the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. Tr. 20. The ALJ therefore properly conducted an assessment of Lynch's residual functional capacity. Specifically, the ALJ found that Lynch had:

> the residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk at least four to six hours in an eight hour workday, and sit at least six hours in an eight hour workday. The claimant can occasionally squat and kneel, and has no other postural limitations.

Tr. 13. In reaching these conclusions, the ALJ considered all of the objective medical evidence in the record, as well as Lynch's own statements to his ability to perform the activities of daily living and as to the frequency and intensity of his pain and other symptoms. Tr. 13-16.

At the fourth step of the five-step process, the ALJ found in light of his RFC that Lynch was unable to perform his past relevant work.  Tr. 16.

At the fifth step, the ALJ found in light of Lynch's age, education, work experience, and RFC that there were jobs existing in significant numbers in the national and local economy that he could perform.  Tr. 17.  Relying in part on the testimony of an objective vocational expert, the ALJ cited as examples of unskilled to semi-skilled, sedentary to light-exertional jobs that Lynch could perform despite the limitations listed in his RFC occupations including cashier II (semi-skilled, light exertion), cafeteria assistant (semi-skilled, light exertion), ticket seller (unskilled, light exertion) and order clerk for food and beverage (unskilled, sedentary).  Tr. 17.  Based on the finding that Lynch could have performed jobs existing in significant numbers in the national economy, the ALJ concluded that he was not disabled as defined in the Act at any time between December 30, 2005, and April 24, 2008.  Tr. 18.

## ANALYSIS

Lynch contends the ALJ erred in several respects.  Specifically, Lynch argues that the ALJ improperly rejected his testimony regarding the severity of his symptoms without giving clear and convincing reasons.  Lynch further asserts that the ALJ improperly discounted the opinion of his treating physician without any clear and convincing reason.  Lynch also claims that the ALJ should have included Lynch's mental limitations at steps two and four of his analysis.  Finally, Lynch argues that the ALJ erred at step five because the hypothetical to the vocational expert improperly excluded the limitations identified in his testimony and by his physician.

## I.     Claimant Credibility

Once a claimant produces medical evidence of an underlying impairment with related

pain symptoms, an ALJ may not reject the claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of that pain. *See Robbins v. Soc. Sec. Admin.* 466 F.3d 880, 883 (9th Cir. 2006). Unless the record has affirmative evidence of malingering, the ALJ can reject the claimant's testimony about the severity of symptoms only by offering specific, clear and convincing reasons for doing so. *See Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). The ALJ must state specifically the facts in the record that lead to his conclusion. *See Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001).

When a claimant's medical record establishes the presence of a "medically determinable impairment" that "could reasonably be expected to produce the [claimant's alleged] pain or other symptoms," the ALJ must evaluate the claimant's credibility in describing the extent of those symptoms. 20 C.F.R. § 404.1529. In the event the ALJ determines that the claimant's report is not credible, such determination must be made "with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002), *citing Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (*en banc*).

In weighing a claimant's credibility, the ALJ may consider, *inter alia*, the "claimant's reputation for truthfulness, inconsistencies either in claimant's testimony or between h[is] testimony and h[is] conduct, claimant's daily activities, h[is] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains." *Id.* (internal modifications omitted), *citing Light v. SSA*, 119 F.3d 789, 792 (9th Cir. 1997). While a finding that a claimant lacks credibility cannot be premised solely on a

lack of medical support for the severity of his pain, *see Light*, 119 F.3d at 792, *citing Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995), where the ALJ's credibility finding is supported by substantial evidence in the record, the finding will not be disturbed, *see Thomas*, 278 F.3d at 959, *citing Morgan v. Commissioner of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999).

Here, the ALJ provided specific, legitimate reasons for rejecting, at least in part, Lynch's testimony regarding the severity of his pain-related limitations. First, the ALJ noted that Lynch stated on his function report that he was capable of lifting 20 pounds, standing for two hours and walking a mile without rest. Tr. 151. On March 28, 2006, Lynch reported cooking 15-20 meals per week for a friend who had suffered a heart attack. Tr. 235. Lynch also testified at the hearing that he rode his bike eight to ten miles each work day. Tr. 34-35.

It is Lynch's position that the ALJ "cherry-picked" isolated portions of his report and ignored material portions improperly. For example, Lynch stated in his function report that his forearms and hands went numb, he could not concentrate due to his medication and he could not reach. Tr. 151. However, Lynch testified at his hearing that he did not have pain in his hand as before, and that the problems with his elbow had been resolved. Tr. 30. He further testified that he could bike for one hour without resting. Tr. 35. In his function report, Lynch also noted that he rode his bike every day. Tr. 150. On the last medical record present in the file (January 10, 2008), Lynch reported to Dr. Butters that he had no wrist pain, and Dr. Butters cleared him to go back to light dumbbells and biking immediately, and to return to golfing in one month. Tr. 440-441. Furthermore, Lynch's own report of his activities is inconsistent with his allegations of disability, in that Lynch was independent in personal care, went outside daily, biked every day for one hour before needing rest, "visited friends and family outside the home twice a week", was

Page  19- FINDINGS AND RECOMMENDATION

able to cook for himself at least twice a week, to wash dishes and laundry, to clean and vacuum his apartment, and to shop for food. Tr. 146-153.

Second, the ALJ cited inconsistencies in Lynch's allegations in being limited in writing and reading. Lynch did not return questionnaires by mail, but instead called the disability agents to write his information over the phone. Tr. 116. Lynch also displayed difficulties in writing and spelling with Dr. Prescott. Tr. 345. As the ALJ correctly noted, Lynch had multiple jobs in the past that required him to read and write. Tr. 116, 119, 137. Lynch also reported reading the newspaper daily, searching for jobs and applying for jobs. Tr. 222. The field officers noted no difficulties with Lynch in reading and writing during their face-to-face interview. Tr. 116, 222. In addition, Lynch told Dr. Prescott that his reading ability was strong. Tr. 342. Taken all together, these statements establish inconsistencies in Lynch's allegations of difficulty in writing and reading.

Third, the ALJ took into account that Lynch had undergone surgery for cubital tunnel syndrome and this suggested that his symptoms were real. Tr. 15. Lynch, however, had no wrist pain after his surgery as he reported to his own surgeon on January 10, 2008,. Tr. 440. Furthermore, on January 9, 2008, Lynch did not report to Dr. Dunn any increased chronic pain. Tr. 443-447. His medication did not require any adjustment at the time. *Id.* In fact, the last time Lynch saw a doctor about increasing his medication due to break-through pain was January 22, 2007. Tr. 376-379. Since then, Lynch was able to control his pain effectively with his pain medication and continued to work as an ice cream server. Tr. 405-406.

Lastly, the ALJ noted that the alleged cause of Lynch's disability was his ankle injury of July 7, 2005. Tr. 15. As the record establishes, by the end of August 2005, the condition of

Page 20- FINDINGS AND RECOMMENDATION

Lynch's ankle had returned to its pre-injury status and Lynch's treating doctor, Dr. Thrall, had returned Lynch to full duty without restriction. Tr. 187-188.

While the proffered reasons are not sufficient to establish conclusively that Lynch had a propensity to exaggerate his symptoms, they do constitute specific and legitimate reasons supported by evidence in the record that are sufficient to permit the conclusion that the ALJ did not arbitrarily reject Lynch's testimony. Indeed, the record establishes that the ALJ afforded Lynch's testimony significant weight, and discredited it only in part, based on legitimate concerns arising out of evidence in the record. Because the ALJ's credibility determination is supported by substantial evidence in the record and was made pursuant to proper legal standards, his credibility finding should not be disturbed.

## II.   Opinion of Treating Physician Dr. Dunn

Joseph Dunn was Lynch's treating physician for chronic left leg pain from April 2003 to October 2003, Tr. 395, and again from March 2006, Tr. 395, through at least March 2008, Tr. 459. On February 21, 2008, he wrote that Lynch could not perform light or medium level work. Tr. 461-462. Dr. Dunn was uncertain whether Lynch could perform sedentary work because he perceived that "day-after day activities and stress w[ould] increase back and chest pain that [were] mechanically and stress related" and that Lynch would miss work due to his impairments more than two days per month. Tr. 463.

In weighing a claimant's medical evidence, the Commissioner generally affords enhanced weight to the opinions of the claimant's treating physicians. See 20 C.F.R. § 404.1527(d)(2). Indeed, where a treating physician's medical opinion is well supported by diagnostic techniques and is not inconsistent with other substantial evidence in the medical record, the treating

Page 21- FINDINGS AND RECOMMENDATION

physician's opinion is accorded controlling weight. *See id.* Moreover, even where a treating

physician's opinion is contradicted by competent medical evidence, it is still entitled to deference.

*See id.*; *see also, e.g., Orn v. Astrue*, 495 F.3d 625, 631-632 (9th Cir. 2007) (where a treating

physician's opinion is contradicted by medical evidence in the record it is "still entitled to

deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527"), *quoting*

S.S.R. No. 96-2p, 1996 SSR LEXIS 9. In consequence, an uncontradicted treating physician's

opinion may only be rejected for "clear and convincing" reasons supported by evidence in the

record, and a contradicted treating physician's opinion may only be rejected for "specific and

legitimate" reasons supported by evidence in the record. *See Reddick v. Chater*, 157 F.3d 715,

725 (9th Cir. 1998), *citing Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).

Notwithstanding the foregoing, no such deference is afforded a treating physician's

opinion as to the ultimate issue of a claimant's disability or as to any other issue reserved to the

ALJ. *See* 20 C.F.R. § 404.1527(e); *see also* S.S.R. No. 96-5p, 1996 SSR LEXIS 2. However,

medical opinions from a treating physician or any other source may not be simply ignored, even

when they bear upon issues reserved to the ALJ, but rather must be evaluated to determine the

extent to which they are supported by evidence in the record. *See* S.S.R. No. 96-5p, 1996 SSR

LEXIS 2. Although the ALJ is required to evaluate every medical opinion, the ALJ is only

required to discuss "significant probative evidence" in his detailed findings. *Vincent on behalf of*

*Vincent v. Heckler*, 739 F.2d 1393, 1394-1395 (9th Cir. 1984) (controverted medical opinion

found to be neither significant nor probative), *quoting Cotter v. Harris*, 642 F.2d 700, 706 (3rd

Cir. 1981).

Lynch argues that the ALJ improperly failed to give controlling weight to Dr. Dunn's

Page  22- FINDINGS AND RECOMMENDATION

opinion, and, in consequence, failed to provide specific reasons for rejecting that opinion. The ALJ stated that he was giving little weight to Dr. Dunn's opinion because Dr. Dunn relied too heavily upon Lynch's subjective reports. Tr. 15-16. Courts have held that when "a treating physician's prescribed work restrictions were based on the [plaintiff's] subjective characterization of [his] symptoms," it is reasonable to discount a physician's opinion that was based on those less than credible statements. *Bray v. Commissioner of SSA*, 554 F.3d 1219, 1228 (9th Cir. 2009). Here, in agreement with the ALJ's opinion, Dr. Dunn himself specifically stated that these disabilities "have been reported by the patient to be true and accurate" and "any further disability and specific information should be obtained by patient's PCP [primary care provider] and IME [independent medical examiner]." Tr. 463.

The ALJ also noted that Dr. Dunn did not have the entire medical record to review. Tr. 16. Dr. Dunn examined Lynch only four times from March 2006 to January 2008. Tr. 376-379, 388-390, 395-400 and 443-451. Dr. Dunn could only review Lynch's two lumbar MRIs from 2003 and 2006 as well as a bone scan from 1999. Tr. 396. During the same time frame, March 2006 to January 2008, Lynch consulted with four other physicians (Dr. Dukeminier once, Dr. Mundall five times, Dr. Gundry once and Dr. Butters four times) and physical therapist Giulietti five times. Tr. 244-245, 333, 405-406, 409-411, 412, 414, 415, 422, 433, 436, 437 and 440-41. In addition to the 2006 lumbar MRI, Lynch had three other tests including total body bone imaging (March 17, 2006), Tr. 403, coronary artery CT angiogram (March 20, 2006), Tr. 254-257, and electrodiagnostic study of Lynch's arm nerves (July 18, 2007), Tr. 422-425. Furthermore, Lynch underwent an operation for his left arm on November 20, 2007. Tr. 434-435. Thus, it is clear that Dr. Dunn only had a fraction of Lynch's medical record. Furthermore,

he only prescribed one of Lynch's pain medications. Tr. 443-451.

It is striking that all five physicians treated Lynch for chronic pain and only one physician voiced his opinion about Lynch's condition. It is also noteworthy that Lynch terminated his treatment with the physical therapist, Giulietti, when Giulietti diagnosed his pain as mainly due to Lynch's incorrect use of his lumbar spine even though Lynch managed to eliminate his chronic pain symptoms when he followed the suggestions of the therapist. Tr. 333. Furthermore, physicians from the State agency evaluated the medical evidence in March 2006 and found that there was no evidence of a significant loss of function that would warrant anything less than medium-level work. Tr. 217-224.

The ALJ is responsible for resolving conflicts in the medical record. *See Benton v. Barnhart*, 331 F.3d 1030, 1040 (9th Cir. 2003). Where, as here, the record contains conflicting medical evidence, the ALJ is charged with determining credibility and resolving the conflict. *Thomas v. Barnhart*, 278 F.3d 947, 956-957 (9th Cir. 2002). The ALJ may reject the opinion of a treating physician in favor of the conflicting opinions of an examining physician if the ALJ makes findings setting forth specific legitimate reasons based on substantial evidence in the record. *Id.* at 957. Given Lynch's credibility issues noted above, Dr. Dunn's reliance on Lynch's self-reports about pain and the conflicting conclusions regarding Lynch's medical condition, there is evidence to support the ALJ's interpretation of the medical record. Thus, the ALJ 's conclusion should not be disturbed.

### III.    Failure to Include Claimant's Mental Impairment in the Sequential Analysis

An ALJ can find an impairment not severe "only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Smolen v.*

*Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citations omitted). "The step-two inquiry is a de

minimis screening device to dispose of groundless claims." *Id.* (citation omitted).

Here, Lynch argues that the ALJ erred in finding that his mental impairments-

adjustment disorder and learning disability- were not severe. The record shows that Lynch

suffered from an adjustment disorder and met the criteria for a learning disorder. Tr. 346. The

ALJ, however, found that Lynch's mental impairments did not cause more than minimal

limitation in Lynch's ability to perform basic mental work activities. Tr. 12.

The ALJ considered four broad functional areas set out in the disability regulations for

evaluating mental disorders and in the section 12.00C of the listing of Impairments. *See* 20 CFR,

Part 404, Subpart P, Appendix 1. These areas are activities of daily living; social functioning;

concentration, persistence, or pace; and episodes of decompensation. *See id.* The ALJ found

Lynch had no limitation for the first functional area, the activities of daily living. Tr. 13. As

Lynch reported to Dr. Prescott during his psychological evaluation, he showered regularly,

prepared breakfast for himself daily, did housework in his apartment, "read newspapers and other

things daily", "got out every day", "biked a lot and got good exercise". Tr. 343-344. The ALJ's

conclusion is based on substantial evidence in the record.

Next, the ALJ considered Lynch's capacity for social functioning and found him to have

mild limitations in that area. Tr. 12. Lynch reported to Dr. Prescott that he had a support system

of friends and family around the area and that he always spent holidays with family. Tr. 344.

The ALJ's conclusion is based on substantial evidence in the record.

The third function area was concentration, persistence or pace. The ALJ found Lynch to

have mild limitations in this area. Tr. 12. Dr. Prescott noted that Lynch had good short term

Page  25- FINDINGS AND RECOMMENDATION

memory and good concentration. Tr. 344. Lynch himself stated that he could concentrate for one hour before needing a break. Tr. 151. Lynch had an average IQ. Tr. 345. Lynch reported reading newspapers daily and filling job applications on a regular basis. Tr. 116. During his evaluation by Dr. Prescott, however, Lynch showed difficulty and nervousness with reading and writing words. Tr. 345. The ALJ's conclusion was thus based on substantial evidence that Lynch had mild limitations in this area.

Lastly, the ALJ considered episodes of decompensation and noted that there was no evidence that Lynch experienced any such episodes. Tr. 12. Analyzing these four areas together, the ALJ correctly determined that Lynch had mild psychological impairments and these impairments were appropriately considered nonsevere. 20 C.F.R. § 416.920a(d)(1). Thus, the ALJ did not err in disregarding Lynch's mental impairments in the residual functional capacity finding.

## IV.    Step Five:  Existence of Jobs the Claimant Could Perform in the National Economy

In step five, the Commissioner must show that the claimant can do other work that exists in the national economy. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995). The Commissioner can satisfy this burden by eliciting the testimony of a vocational expert with a hypothetical question that sets forth all the limitations of the claimant. *Id.* The hypothetical posed to a vocational expert must only include those limitations supported by substantial evidence. *Robbins*, 466 F.3d at 886. "Conversely, an ALJ is not free to disregard properly supported limitations." *Id.*

Lynch argues that the ALJ erred in finding that Lynch had the residual functional capacity to perform alternative jobs in the national economy. Lynch argues that the ALJ's hypothetical

Page  26- FINDINGS AND RECOMMENDATION

should have included limitations identified by Dr. Dunn. Dr. Dunn stated that Lynch might not be able to perform sedentary work because "day-after day activities and stress w[ould] increase back and chest pain that [were] mechanically and stress related." Tr. 463. In addition, Lynch argues that the hypothetical should have included his testimony that he needed to lie down for two hours after working four to six hours. Tr. 62. Lastly, Lynch argues that the hypothetical should have included his mental impairments of adjustment disorder and learning disorder. As discussed above, the ALJ properly discounted Dr. Dunn's opinion and Lynch's testimony. As a result, the ALJ did not err when he excluded the limitations identified by Dr. Dunn and Lynch from the hypothetical posed to the vocational expert.

Lastly, the jobs identified by the vocational expert - cashier II, ticket seller and order taker - do not require writing "compound and complex sentences, using the cursive style, proper end punctuation and employing adjectives and adverbs" as claimed by Lynch. The DOT requires education of a general nature which does not have a recognized, fairly specific occupational objective and such education is usually obtained in elementary school, high school, or college but also from experience and self-study. DOT, Appendix C, 1991 WL 688702. Because Lynch had thirteen years of education including one year of college, he acquired transferable skills from his previous employments, and because Lynch had the residual functional capacity to perform light or sedentary work, the argument that Lynch is conclusively disabled pursuant to the grids is unfounded. The ALJ's decision should therefore not be undisturbed.

## CONCLUSION

For the reasons set forth above, I recommend that the Commissioner's final decision be affirmed. A final judgment should be prepared.

Page 27- FINDINGS AND RECOMMENDATION

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 26th day of July, 2010.

Honorable Paul Papak
United States Magistrate Judge